**SIGNED.**

Dated: August 06, 2010



**JAMES M. MARLAR**
**Chief Bankruptcy Judge**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 |
| SUNRISE HOSPITALITY LLC, | No. 4:09-bk-26457-JMM |
| Debtor. | **MEMORANDUM DECISION** |

A confirmation hearing on the Debtor's plan of reorganization was held on May 26, May 28, June 22, and August 4, 2010. After presentation of testimony, documentary evidence, written and oral arguments, the parties submitted the case for decision. The court now rules.

## **BACKGROUND**

1. The Debtor operates a Holiday Inn Express in Florence, Arizona.
2. The Debtor is a Nevada limited liability company, which owns approximately 2.44 acres of real property located at 1200 Sunrise Plaza Drive, Florence, Arizona 85232, in Pinal County (the "Real Property"). The Real Property consists of a Class A, three story, 90 room hotel ("Hotel"), known as Holiday Inn Express Suites, with 53,878 square feet.
3. The sole member of the Debtor is Emmanuel Ikharebha.
4. The Debtor executed a Promissory Note and Construction Deed of Trust in favor of Choice Bank which advanced funds to the Debtor, in the original principal amount of

1 $5,510,000.00 (the "Loan"), under the terms of that certain Promissory Note ("Note") dated June 25, 2007. (Ex. A.)

5. As security for the Loan and the Note, the Debtor entered into a Construction Deed of Trust (the "Deed of Trust"), dated June 25, 2007, in favor of Choice Bank and against the Real Property. Choice Bank assigned and transferred its interest in the Deed of Trust to EK Nevada, Inc., pursuant to an Assignment of Deed of Trust, dated April 13, 2009.

6. EK Nevada, Inc. assigned and transferred its interest in the Deed of Trust to HIE Servicing, LLC ("HIE"), pursuant to an Assignment of Deed of Trust, dated April 13, 2009. The Promissory Note, Deed of Trust, Choice Bank Assignment of Deed of Trust, and the EK Assignment of Deed of Trust are hereinafter collectively referred to as the "Loan Documents".

7. Pursuant to the terms of the Loan Documents, HIE is the current owner and holder of a properly perfected senior lien on the Real Property and all personal property (the "Personal Property"), including all hotel room rents, any and all insurance policies, reserves, accounts, escrows, claims, deposits, contract rights, any other form of income relating to the Real Property and any and all proceeds, products, rents or profits from any of the foregoing. The Real Property and the Personal Property are collectively referred to hereinafter as the "Property."

8. HIE has asserted that the principal amount of its claim against the Debtor is $5,461,267.00 as of September 16, 2009, plus any and all additional accrued and unpaid interest thereon and any and all fees, charges and other amounts due under the Promissory Note dated June 25, 2007 and all other written agreements or other loan documents executed in connection therewith (collectively, the "Pre-petition Loan Documents"), including without limitation, all attorneys' fees and costs (collectively, the "Outstanding Balance").

9. Pursuant to the Pre-petition Loan Documents, the Lender holds a valid, perfected and first priority pre-petition and post-petition lien on the Property, including any and all hotel room rents and other income generated by or arising from the Real Property.

10. When the Debtor fell behind in its payment to HIE, a foreclosure sale was commenced.

# ADMINISTRATIVE CASE

In order to halt the foreclosure sale, the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 19, 2009 (the "Petition Date").

1. The Debtor has operated its business and managed its property as a debtor in possession.

2. The Debtor has been operating its business in compliance with a Stipulated Order Authorizing Use of Cash Collateral and Lifting Automatic Stay (the "Stipulated Order") filed November 2, 2009 (ECF No. 33), as stipulated by the Debtor and the Lender.

3. The Debtor filed its Second Amended Plan of Reorganization Dated April 16, 2010 ("Second Amended Plan") at ECF No. 105, and its Second Amended Disclosure Statement for Second Amended Plan of Reorganization Dated April 16, 2010 ("Second Amended Disclosure Statement") at ECF No. 106.

4. On April 16, 2010, this Court approved the Second Amended Disclosure Statement (ECF No. 109), and in accordance with that Order, the Debtor has solicited acceptances of the Second Amended Plan.

5. As of April 17, 2010, any party in interest had the right to file a proposed plan of reorganization, and HIE has done so. Its Disclosure Statement (ECF No. 148) will be acted upon on September 8, 2010 (ECF No. 152), unless the Debtor's Second Amended Plan is confirmed, which will moot out further proceedings

6. The Debtor is seeking confirmation of the Second Amended Plan pursuant to 11 U.S.C. §1129 and other applicable provisions of the Bankruptcy Code.

# THE SECOND AMENDED PLAN

The Debtor's Second Amended Plan is dated April 16, 2010, and was voted upon by its creditor classes. The Second Amended Plan consists of seven classes, whose treatment and balloting is as follows:

| Class | Type | Treatment | Impaired | Vote[1] |
|---|---|---|---|---|
| 1 | Administrative | Paid in full on effective date (11 days after confirmation), or as parties agree. | No | N/A |
| 2 | Real Property Secured Tax Claims | 25% paid on effective date, or "as soon thereafter as practicable." Full balance, no later than one year after confirmation. Retain lien. | Yes | N/A |
| 3 | HIE--Secured | Secured portion (either $4,175,000 or such other amount as determined by the court) paid in the following manner.<br>1. Year One Following Confirmation: Interest only at 5%.<br>2. Full Repayment: Monthly principal and interest based on a 20-year amortization.<br>3. Balloon at 10th anniversary (or upon sale or refinance).<br>4. Retain lien. | Yes | Reject |
| 4 | ADOR and Town of Florence Personal Property Taxes | Paid in full over five years | Yes | ADOR--Accept Florence--Reject |
| 5 | Unsecured Creditors | Paid from available net revenues without interest. If not paid in full by 10th anniversary, balance will be deemed satisfied. | Yes | Accept, *infra* |
| 6 | Debtor's Affiliates | Paid only after Classes 1-5 are paid in full. | Yes | Deemed rejected |
| 7 | Interest Holders | Retain interests. Contribute $100,000 new value over ten years at $10,000 per year. | Yes. | Deemed rejected |

The Second Amended Plan's payments are to be implemented solely by revenues from the Hotel, plus the infusion of $100,000 as a "new value" contribution by the Debtor's sole shareholder, Mr. Ikharebha, at the rate of $10,000 per year. No other new capital is being obtained from any source.

---

[1] Ballot Report, ECF No. 120.

# **BALLOTING UNCERTAINTIES: ORGANIZING AND SETTLING THE ISSUES**

The Debtor's Second Amended Plan is subject to several uncertainties until the court rules. The first decision is the fair market value for the project, which will impact the feasibility of the Second Amended Plan. Depending on the value calculation, HIE's claim could also have an unsecured component, which could thereby impact the Class V unsecured class tally.

The second uncertainty deals with how to deal with an unsecured creditor's late effort to change its ballot from an acceptance to a rejection. That creditor is Business Development Finance Corp. ("BDFC"), which filed a proof of claim for $2,000,000 (Claims Register, Claim No. 2). It appears, as matters have settled down in the case, that BDFC now considers itself to be wholly unsecured, due to its junior interest being subordinate to the senior secured interest of HIE. Thus, for purposes of this proceeding, BDFC will be treated as wholly unsecured.

The third uncertainty is what interest rate to apply to the secured value payout.

## **A. Fair Market Value of the Property**

As to the Property's value, the court heard from two parties, Jan Sell and Mr. Ikharebha.

Mr. Sell is an MAI appraiser, with a long list of credentials. His expertise has been in the area of valuation of commercial properties in Arizona (HIE Ex. 0.0). After analyzing the revenue stream from the Debtor's Hotel, and applying an appraiser's methodology to all of the relevant factors, Mr. Sell opined that the Property's value was $5,220,000.

The Debtor did not call an expert witness, but relied instead upon the opinion of the Debtor's principal and 100% shareholder, Mr. Ikharebha. Mr. Ikharebha readily acknowledged that he was not qualified as a real estate appraiser, but that he did his best to approximate how an appraiser might arrive at a different figure. He guessed that the Property's value, in his opinion, was $4,175,000. FED. R. EVID. 701, an owner (and by analogy a principal of a corporate owner), can

give his estimate of value. 2 Hon. Barry Russell, BANKRUPTCY EVIDENCE MANUAL, § 701:2 (2009-2010 ed).

Although the Debtor's principal was sincere in his approach to value, the court finds and concludes that the expert's opinion, by virtue of his experience and training, is more persuasive, and therefore finds the Property's value to be $5,220,000.

### **B. HIE's Unsecured Claim**

HIE voted to reject the Debtor's Second Amended Plan. As the only Class 3 secured creditor, HIE's rejecting ballot is therefore $5,220,000.

But HIE's amended proof of claim is for $5,931,941.20. Therefore, for voting purposes, the unsecured portion of HIE's claim is carried over--also as a rejecting vote--to the Class 5 unsecured class, for $711,941.20.

### **C. BDFC's Motion to Change Its Ballot**

BDFC voted to accept Debtor's Second Amended Plan, as a Class 5 unsecured creditor. The Debtor therefore included it in its Ballot Report as an accepting impaired creditor.

On May 25, 2010, on the eve of the confirmation hearing, BDFC asked the court for permission to change its ballot to a rejecting one. It based its motion on developments, learned at Mr. Ikharebha's post-vote deposition (both events occurring with a few days of the confirmation hearing), which caused it "great concern" over the Debtor's ability to properly manage the Property, as well as a settlement which it reached with the senior lender, HIE.

The order fixing the time for the filing of the ballots was docketed on April 16, 2010 (ECF No. 109). It set May 19, 2010, as the last day for filing acceptances or rejections. By the same order, the confirmation hearing was scheduled to begin on May 26, 2010.

On May 19, 2010, BDFC voted to accept the Second Amended Plan.

On May 20, 2010, the deposition of Mr. Ikharebha occurred.

On May 25, 2010, BDFC filed its motion to change its accepting ballot to a rejecting one.

The confirmation hearing began on May 26, 2010. It continued on May 28, 2010, and concluded on June 22, 2010.

The Debtor responds that "cause," under FED. R. BANKR. P. 3018, has not been shown by BDFC. It cites authority which discourages late and pivotal decisions which impact a debtor's right to confirm its plan. Administratively, too, the court needs a reasonable deadline to close the voting. Here, the court finds that last-minute discussions between two secured creditors to "divide up the pie" between themselves is not a good enough reason to alter the voting record.

"Vote changing is the exception and not the rule." *In re Featherworks Corp.*, 36 B.R. 460, 462-63 (E.D.N.Y. 1984); *In re Dow Corning Corp.*, 237 B.R. 374 (Bankr. E.D. Mich. 1999): "The test for showing whether cause has been shown should often not be a difficult one to meet. As long as the reason for the vote change is not tainted, the change of vote should usually be permitted. The court must only ensure that the change is not improperly motivated." (citing COLLIER ON BANKRUPTCY).

Accordingly, BDFC's motion to change its ballot will be DENIED.

## **THE FINAL CLASS 5 TALLY**

The court now must calculate the unsecured votes based upon its findings, and in doing so, looks to the Debtor's Ballot Report filed on May 21, 2010. The tally is:

| Creditor | Vote | Amount | Source |
|---|---|---|---|
| American Hotel Register | Accept | $3,921.70 | Claim |
| Arizona Dept. of Revenue | Accept | 250,000.00 | Claim |
| Burch & Cracchiolo | Accept | 10,763.62 | Claim |
| Business Development Finance Corp. ("BDFC") | Accept | 2,000,000.00 | Claim |
| Carver & Associates | Accept | 343,529.54 | Claim |

| | | | |
|---|---|---|---|
| Coastal Installations | Accept | 1,448.00 | Claim |
| Gail Robertson | Accept | 900.00 | Schedules |
| Gila River Displays | Accept | 15,900.00 | Schedules |
| HIE Servicing, LLC ("HIE") | **Reject** | 711,941.20 | Court Ruling, *supra* |
| Holiday Hospitality Franchising | Accept | 34,478.56 | Claim |
| Jones Outdoor | Accept | 1,239.87 | Claim |
| Key Equipment Finance | Accept | 54,678.70 | Claim |
| Knochel Brothers Inc. | Accept | 94,339.74 | Claim |
| David Kolloway | Accept | 102,000.00 | Schedules |
| Play Network | Accept | 5,043.73 | Schedules |
| Steele Engineering | Accept | 7,000.00 | Schedules |
| YESCO | Accept | 750.00 | Claim |
| **TOTAL CLAIMS** | | $3,637,934.66 | |
| **ACCEPTING AMOUNT** | | $2,925,993.46 | |
| **ACCEPTING NUMBER** | | 16 | |
| **ACCEPTING PERCENTAGE** | | 80.4% | |
| **REJECTING AMOUNT** | | $711,941.20 | |
| **REJECTING NUMBER** | | 1 | |
| **REJECTING PERCENTAGE** | | 19.6% | |

Thus, the Debtor has received the necessary votes, in both number and amount, to gain an acceptance by the impaired Class 5 group. § 1126(c).

Of its eligible voting classes, the Debtor received acceptances from only its unsecured creditors (Class 5), and rejections from its priority tax claimants (Class 4) and its major secured claimant (Class 3). It has but a single impaired, consenting class.

8

## DEBTOR'S OBJECTION TO HIE CLAIM

Although the Debtor has objected to the HIE claim, that issue was not presented at the confirmation hearing. It is therefore reserved for a later date, and that dispute is premature at this time.

## OPERATIONS DURING CHAPTER 11

During the period that the Debtor has operating in the Chapter 11 case, its gross figures for income and actual operating expenses have been reported as follows:

| **Filed** | **ECF No.** | **Period** | **Income** | **Op. Expenses** | **Profit (Loss)[2]** |
|---|---|---|---|---|---|
| 01/16/09 | 49 | October (stub) | $61,110 | $8,281 | $52,828 |
| 12/15/09 | 59 (revised) | October (stub) | 61,110 | 16,283 | 44,827 |
| 12/15/09 | 60 | November | 88,503 | 69,057 | 19,445 |
| 01/15/10 | 69 | December | 81,083 | 57,179 | 23,904 |
| 02/16/10 | 79 | January | 105,772 | 56,588 | 49,204 |
| 03/15/10 | 91 | February | 152,406 | 58,544 | 93,861 |
| 04/15/10 | 103 | March | 155,427 | 74,258 | 81,169 |
| 05/17/10 | 114 | April | 150,878 | 125,647 | 25,230 |
| 06/15/10 | 135 | May | 101,121 | 65,891 | 35,229 |
| 07/15/10 | 154 | June | 86,317 | 66,694 | 19,622 |

## CALCULATING MARKET RATE OF INTEREST

The Debtor's Second Amended Plan proposes to pay HIE five percent (5%) simple interest on its secured claim, now determined to be $5,220,000. The court received evidence from HIE's expert, Edward M. Burr, that a market rate of interest, on a 100% "loan-to-value", would vary

---

[2] These figures exclude interest expense and depreciation.

widely. Mr. Burr did note that prime rate is currently 3.25%, and that any investor would be seeking at least a 4.0% return on investment. The HIE note itself (Ex. A) carries a 9.75% interest rate. Mr. Burr opined that an added "risk factor" for this Debtor, on this Property, could range from 3% to 8.75%. He pegged what he felt was an appropriate rate for this Property at 16%.

After considering all of the factors of this case, along with an appropriate risk analysis, the court concludes that 9.75%, is a reasonable and fair market rate of interest for the "forced cramdown loan" at issue here. Looked at another way, if a risk-free loan is in the 7.25% range, the added risk for this Debtor, this Property and this management would add an extra 2.5%. The total is 9.75% *In re Fowler*, 903 F.2d 694 (9th Cir.1990); *In re Camino Real Landscape Maintenance Contractors*, 818 F.2d 1503 (9th Cir. 1987).

Under the Debtor's Second Amended Plan, the first year's interest-only payment to HIE, and the next 20 years' amortized principal and interest, would be:

| Period | Provision | Annual Payment | Monthly Payment |
|---|---|---|---|
| Year 1 | Interest only at 9.75% on principal of $5,220,000 | $508,950 | $42,412 |
| Years 2- 21 (20 years) | Principal and interest amortized | 594,151.20 | 49,512.60 |

## **PAYMENTS UNDER THE SECOND AMENDED PLAN**

Under the Debtor's Second Amended Plan, only three classes of creditors are scheduled to receive payments. These are real property secured claims (Class 2), HIE (Class 3) and the Arizona Department of Revenue and the Town of Florence (Class 5). Everyone else (unsecured creditors), simply divide whatever is left over, although the Debtor's principal, Mr. Ikharebha, testified that he believed such creditors would receive approximately 54%, or about $2,000,000, over the Second Amended Plan's ten-year term.

Thus, attempting to calculate what will be due to these three classes in year one, and then subsequent years, can be gleaned through various sources:

Case 4:09-bk-26457-JMM   Doc 165   Filed 08/06/10   Entered 08/09/10 07:32:44   Desc
                         Main Document    Page 10 of 15

### A. Year One (First Year Only)

| Class/Creditor | Principal | Source | Monthly Obligation | Effective Date | Balance Due--One Year | Annual Requirement |
|---|---|---|---|---|---|---|
| 2 - Pinal County | $56,399 | Claim | n/a | $14,100 | $42,299 | $56,399 |
| 3 - HIE (interest only at 9.75%) | 5,220,000 | Court Ruling | $42,412 | -- | -- | 508,950 |
| 4 - AZ Dept of Revenue (Priority) | 181,996 | Claim | 3,033 | -- | -- | 36,399 |
| 4 - Town of Florence | 3,199 | Claim | 53 | -- | -- | 640 |
| **DUE TO SCHEDULED CREDITORS--FIRST YEAR** | | | | | | $602,388 |

### B. Years Two--Five (Four Years)

| Class/Creditor | Principal | Source | Monthly Obligation | Annual Requirement |
|---|---|---|---|---|
| 3 - HIE | $5,220,000 (plus interest at 9.75%) | Court Ruling | $49,512 | $594,144 |
| 4 - AZ Dept of Revenue | Reducing | Claim | 3,033 | 36,399 |
| 4 - Town of Florence | Reducing | Claim | 53 | 640 |
| **ANNUAL REQUIREMENT (4 YEARS)** | | | | $631,183 |

### C. Years Six - Twenty One (Fifteen Years)

| Class/Creditor | Principal | Source | Monthly Obligation | Annual Requirement |
|---|---|---|---|---|
| 3 - HIE | $5,220,000 (plus interest at 9.75%) | Court Ruling | $49,512 | $594,144 |

The Debtor's Second Amended Plan projects a payoff (balloon) at the end of the tenth year. The method or source of that payoff was speculative or not clear from the evidence.

And it is unclear as to how unsecured creditors will ever realize $2 million on their claims.

## **FEASIBILITY--§ 1129(a)(11)**

Section 1129(a)(11) is Chapter 11's most important requirement. This section requires proof that a plan is capable of being performed as contemplated.

"A plan meets this feasibility standard if the plan offers a reasonable prospect of success and is workable. The prospect of financial uncertainty does not defeat plan confirmation on feasibility grounds since a guaranty of the future is not required. The mere potential for failure of the plan is insufficient to disprove feasibility." *In re Patrician St. Joseph Partners Ltd. Partnership*, 169 B.R. 669, 674 (D. Ariz. 1994).

On the other side of the coin, "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan that the debtor can possibly attain after confirmation." *Matter of Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985).

In the instant case, the Debtor has filed Operating Reports which reflect that, from November, 2009, through June, 2010 (eight months), it has generated $347,664 in net profit, or an average of $43,458 per month. If that figure is projected over a 12-month period, the Debtor could theoretically receive $521,496 with which it must service some current debt, replace lost or damaged items, prepare for contingencies and pay ongoing real property taxes of approximately $44,000 each year. For the first five crucial years, and even into the years beyond, it appears that the Debtor will come up short.[3]

The court has difficulty with the Debtor's projections (Ex. 26). Using the true value

---

[3] By this rudimentary analysis, the Debtor theoretically should or could have about $347,664 in its bank accounts. But its most recently monthly Operating Report shows only $121,180.47 in the bank. Perhaps some of this reduction is explained by about $180,000 in payments to HIE by a cash collateral stipulation. Thus, the Debtor has inadequate cash or reserves on hand, as well. It will not be able to perform as contemplated.

12

for HIE's claim, it does not seem realistic that the Debtor can service routine operational expenses, real and personal property tax requirements, payments under the Second Amended Plan, and eventually pay 54% to unsecured creditors amounting to about $2 million.

The Debtor's past history does not justify these results, since Mr. Ikharebha has had no previous experience in the hotel management business, relies to some degree on vague unwritten "contracts" with the military, failed to pay real property taxes, used collected sales taxes to fund day-to-day operations and blames the Town of Florence for the project's failure to gain a final certificate of occupancy on the grounds that, "They all lied."

The projections (Ex. 26) were based on a value for the Property of $4,175,000, and a 5% interest rate. Now, the Property value is $1,025,000 higher, and the interest rate has almost doubled.

To add to the speculative nature of the Second Amended Plan, Mr. Ikharebha was asked if one of the bases for his optimism was whether he was "relying on new businesses sprouting up in Florence as a means of increasing revenue," to which he replied, "Absolutely." Unfortunately for the Debtor, no evidence was presented to back up this vision of the future. And, even if credible, it was not shown how such new business would add to the hotel's revenues.

Other witnesses gave the Debtor bad marks, as well, regarding management. For example, Ms. Joan Brubacher testified that the Debtor had no organized financial system in place, and that it was "largely nonexistent" except for a QuickBooks program; that the Debtor operated "out of its checkbook," failed to balance or reconcile its cash, had "piles of unopened bills" with "disbursements that did not match with invoices." Additionally, no historical bookkeeping records existed.

When Mr. Ikharebha was asked why he had used collected sales tax revenues to run the business' daily activities, he responded, "I have no answer to that."

Finally, no competent evidence was provided which would tend to prove that the Debtor would be able to pay a balloon payment in ten years. Or, for that matter, was the optimistic view that unsecured creditors would receive about $2 million rationally supported by the evidence.

In conclusion, the Debtor did not carry its burden of proof that the Second Amended Plan was feasible. Like so many other cases, the Debtor was undercapitalized from the outset, and suffers the same fate going forward.

## **POST-CONFIRMATION MANAGEMENT--§ 1129(a)(5)**

The court must also find that the retention of current management is not "consistent with the interests of creditors." Consequently, the Debtor failed to prove, to the court's satisfaction, the necessary § 1129(a)(5) element needed for confirmation.

## **OTHER PROVISIONS OF THE CODE**

As for the remaining provisions of § 1129(a), the court concludes that the Debtor has complied with:

| | | |
|---|---|---|
| • | § 1129(a) (1) and (2) | Compliance with the Code |
| • | § 1129(a)(3) | Good faith |
| • | § 1129(a)(4) | Professional fees must be approved by the court |
| • | § 1129(a)(6) | Not applicable |
| • | § 1129(a)(7) | Best interests tests |
| • | § 1129(a)(8) | Satisfied and/or superceded by § 1129(a)(10) |
| • | § 1129(a)(9) | Satisfied the statute relative to priority tax claims |
| • | § 1129(a)(10) | Has at least one impaired consenting class |
| • | § 1129(a)(12) | U.S. Trustee fees can be paid |
| • | § 1129(a)(13), (14), (15) and (16) | Not applicable |

Because the Debtor failed to prove all applicable elements of § 1129(a), it is unnecessary for the court to consider the "cramdown" requirements of § 1129(b)(2)(A) as to HIE (except that the finding of an interest rate was necessary to discuss feasibility).

As for the "absolute priority" issue associated with § 1129(b)(2)(B)(ii), the court finds it unnecessary to consider that issue, as the failure to confirm on feasibility grounds moots out this point.

## **CONCLUSION**

The Debtor's Second Amended Plan of Reorganization cannot be confirmed. A separate order will be entered.

DATED AND SIGNED ABOVE.

COPIES to be sent by the Bankruptcy Notification Center ("BNC") to the following:

Shelton L. Freeman, Attorney for Debtor

Christopher R. Kaup, Attorney for HIE Servicing

R. David Sobel, Attorney for Business Development Finance Corp.

Office of the U.S. Trustee